**THE WAGNER FIRM**
Avi Wagner (#226688)
 *avi@thewagnerfirm.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:     (310) 491-7949
Facsimile:      (310) 491-7949

**BRAGAR EAGEL & SQUIRE, P.C.**
David J. Stone (#208961)
 *stone@bespc.com*
Melissa A. Fortunato (#319767)
 *fortunato@bespc.com*
Todd H. Henderson
 *henderson@bespc.com*
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:     (212) 308-5858
Facsimile:      (212) 486-0462

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Riccardo Baron, Derivatively on Behalf of LENDINGCLUB CORPORATION,<br><br>                          Plaintiff,<br><br>              v.<br><br>SCOTT SANBORN, STEVE ALLOCCA, SAMEER GULATI, THOMAS W. CASEY, RENAUD LAPLANCHE, CARRIE L. DOLAN, JOHN C. MORRIS, DAN CIPORIN, KEN DENMAN, JOHN MACK, TIMOTHY J. MAYOPOULOS, PATTY McCORD, MARY MEEKER, and SIMON WILLIAMS,<br><br>                          Defendants,<br><br>              -and-<br><br>LENDINGCLUB CORPORATION,<br><br>                          Nominal Defendant. | ) Case No.:<br>)<br>) **VERIFIED STOCKHOLDER DERIVATIVE**<br>) **COMPLAINT FOR VIOLATION OF THE**<br>) **FEDERAL SECURITIES LAWS, BREACH**<br>) **OF FIDUCIARY DUTY, UNJUST**<br>) **ENRICHMENT, AND WASTE OF**<br>) **CORPORATE ASSETS**<br>)<br>) <u>**DEMAND FOR JURY TRIAL**</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

        Plaintiff Riccardo Baron ("Plaintiff"), by and through his undersigned counsel, brings

this Verified Stockholder Derivative Complaint for Violations of the Federal Securities Laws,

Breach of Fiduciary Duty, Unjust Enrichment, and Waste of Corporate Assets on behalf of

nominal defendant LendingClub Corporation ("LendingClub" or the "Company") against certain

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

current and former directors and officers of LendingClub. Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to: (i) review and analysis of public filings made by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, financial statements, and other publicly available sources; (ii) review of court filings in the securities class action lawsuit alleging violations of the federal securities law based on similar facts and circumstances as alleged herein, captioned *Veal v. LendingClub Corporation, et al.*, No. 3:18-cv-02599 (NDCA) (the "Securities Class Action"); and (iii) review of court filings and press releases in the complaint and investigation by the Federal Trade Commission ("FTC") based on similar facts and circumstances as alleged herein, captioned *Federal Trade Commission v. LendingClub Corporation*, No. 3:18-cv-02454 (NDCA) (the "FTC Complaint").

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of LendingClub at all relevant times, on behalf of the Company against the Individual Defendants (as defined herein). Plaintiff seeks to remedy the Individual Defendants' violations of state and federal law from at least February 28, 2015 to the present (the "Relevant Period") that have caused and continue to cause substantial monetary damages to LendingClub and other damages, including damages to its reputation and goodwill.

2.      During the Relevant Period, the Individual Defendants caused or allowed LendingClub to issue or make materially false and misleading statements concerning the Company's business operations, treatment of customers, and compliance with federal laws. Additionally, the Individual Defendants caused or allowed LendingClub to employ a scheme to deceive its customers and file false and misleading statements with the SEC.

3.      LendingClub operates an online marketplace platform that connects borrowers and investors in the United States.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

4.      Throughout the Relevant Period, the Individual Defendants consistently caused LendingClub to market to consumers that its services contained "no hidden fees."  This claim was ever-present in advertisements, the loan application interface, and in SEC filings.

5.      The Individual Defendants also caused LendingClub to routinely misrepresent to customers that their loan application had been approved, when it had not and likely would not. This scheme worked by telling customers that "Your Loan is 100% Backed" and "Great news! Investors have backed your loan 100%.  Your money is almost in your hand.  You can always visit your Account Summary to view the details of your loan.  Welcome to Lending Club!" after they had filled out the initial application and garnered investor funding, long before the application had gone through the much more rigorous "back-end" review by LendingClub.  It turned out that many consumers who received these messages were subsequently rejected by LendingClub's "back-end" credit and background check and never received a loan.  Of approximately 196,000 consumers who receive these messages, 43,000 were subsequently rejected.  These misleading messages caused many consumers to not seek other credit or turn down offers from other institutions because they thought their loan from LendingClub was forthcoming.  This was a common issue that LendingClub's compliance function would or should have been aware of, as the Company's training materials list "What does this mean?  I thought I was approved" as a commonly asked question of customer service representatives.

6.      Throughout the Relevant Period, the Individual Defendants also caused or allowed the Company to regularly make unauthorized and improper electronic bank account withdrawals from its customers.  These charges included double charges without authorization, automatic withdrawals after customers had opted out, and automatic withdrawals after loans had been repaid.  The Company also failed to adequately provide notice of these withdrawals to customers and the customers would not learn about the withdrawals until they checked their bank statements.

7.      In addition, LendingClub is a financial institution subject to the Gramm-Leach-Bliley Act ("GLBA") because, among other things, the Company services loans.  LendingClub collects nonpublic personal information from its customers, such as Social Security numbers and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

bank routing information.  The Company is therefore subject to the requirements of the Gramm-Leach-Bliley Privacy Rule, 16 C.F.R. Part 313 (the "GLB Privacy Rule"), and Reg. P., 12 C.F.R. Part 1016 ("Reg. P.").  The GLB Privacy Rule and Reg. P. require financial institutions, such as LendingClub, to provide their customers with initial and annual privacy notices that are "clear and conspicuous" and "accurately reflect . . . privacy policies and practices."  These notices must include specific elements, such as the categories of nonpublic personal information collected and disclosed, the categories of third parties to whom the information is disclosed, and the financial institution's security and confidentiality polices.  Throughout the Relevant Period, LendingClub failed to deliver the initial privacy notice to each customer as a necessary step to obtaining a loan.  Instead, LendingClub merely required customers to agree to its Terms of Use, which itself only included a link to its privacy policy.  To reach the privacy notice, consumers were required to click on a link that did not indicate it was related to privacy, and then find yet another link to LendingClub's privacy policy within the lengthy document to which the link initially led.  This was far short of the required "clear and conspicuous" privacy notice.

8.    Throughout the Relevant Period, the Individual Defendants caused LendingClub to file statements with the SEC that touted the Company's "no hidden fees" loan policy and represented that the Company was in compliance with state and federal law, specifically the GLBA.  It was not.

9.    This house of cards came crumbling down on April 25, 2018, when the FTC filed the FTC Complaint in this Court alleging the consumer protection violations described in ¶¶ 4-8 above.  The FTC Complaint seeks (a) to have LendingClub enjoined from continuing these practices;  (b) monetary relief to redress injured consumers;  (c) rescission of contracts, (d) disgorgement of ill-gotten gains; (e) restitution; and (f) the refund of monies paid.  Thus, the Individual Defendants' actions will likely result in hundreds of millions of dollars of liability for the Company.

10.    On May 2, 2018, the Securities Class Action was filed in this Court alleging that LendingClub, former Chief Executive Officer ("CEO") Renaud Laplanche ("Laplanche"), current CEO and director Scott Sanborn ("Sanborn"), former Chief Financial Officer ("CFO")

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    Carrie L. Dolan ("Dolan"), former Corporate Controller, Principal Accounting Officer, and

2    Interim-CFO Bradley Coleman ("Coleman"), and current CFO Thomas W. Casey ("Casey")

3    violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act")

4    (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-

5    5) by issuing false and misleading statements regarding the Company's "no hidden fees" policy

6    and GLBA compliance.

7         11.    Specifically, the Individual Defendants were motivated to engage in a fraudulent

8    course of conduct to allow certain Company insiders and others to sell more than 900,000 of

9    their personally-held LendingClub common stock at artificially-inflated prices for gross proceeds

10   of over $5 million.

11        12.    The Individual Defendants breached their fiduciary duties of loyalty, candor, due

12   care, and good faith by willfully engaging in the deceptions alleged herein.

13        13.    As a direct and proximate result of the Individual Defendants' breaches of

14   fiduciary duties, LendingClub has sustained damages as described below.

15                            **JURISDICTION AND VENUE**

16        14.    Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has

17   jurisdiction over the claims asserted herein for violations of Sections 10(b) and 14(a) of the

18   Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28

19   U.S.C. § 1367.

20        15.    This Court has jurisdiction over each defendant named herein because each

21   defendant is either a corporation that conducts business in and maintains operations in this

22   District or is an individual who has sufficient minimum contacts with this District to render the

23   exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

24        16.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because:

25   (i) LendingClub maintains its principal place of business in this District; (ii) one or more of the

26   defendants either resides in or maintains executive offices in this District; (iii) a substantial

27   portion of the transactions and wrongs complained of herein, including the defendants' primary

28   participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in

1    violation of fiduciary duties owed to LendingClub, occurred in this District; and (iv) defendants
2    have received substantial compensation in this District by doing business here and engaging in
3    numerous activities that had an effect in this District.

4    **INTRADISTRICT ASSIGNMENT**

5    17.    A substantial portion of the transactions and wrongdoings that gave rise to the
6    claims in this action occurred in the County of San Francisco, and as such, this action is properly
7    assigned to the San Francisco division of this Court.

8    **THE PARTIES**

9    **Plaintiff**

10    18.    Plaintiff has been a continuous stockholder of LendingClub since 2015.

11    **Nominal Defendant**

12    19.    LendingClub is a Delaware corporation with principal executive offices located at
13    71 Stevenson Street, Suite 300, San Francisco, California 94105.  Founded in 2006, LendingClub
14    had its initial public offering in 2014.  It is the first peer-to-peer lender to register its offerings as
15    securities with the SEC.  It trades on the New York Stock Exchange under the ticker symbol
16    "LC."

17    **Defendants**

18    20.    Sanborn has been LendingClub's CEO since June 2016.  Following an earlier
19    incident involving inadequate internal controls over financial reporting, he was hired to
20    transform the Company and bring a heightened degree of transparency.  As described herein, he
21    has not been successful.  Sanborn has worked at the Company since 2012, and has held several
22    roles including President, Chief Marketing Officer, and Chief Operations Officer.  He has been a
23    director of LendingClub since 2016.  Sanborn sold personally-held LendingClub stock at
24    artificially-inflated prices during the Relevant Period for proceeds of over $1.6 million.

25    21.    Steve Allocca ("Allocca") has been the President of LendingClub since May 16,
26    2017.  He was appointed to serve as president due to his history at PayPal, with the stated goal of
27    leading LendingClub's "efforts to deliver affordable credit to more people across an expanding

28

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

range of product categories."  Allocca sold personally-held LendingClub stock at artificially-inflated prices during the Relevant Period for proceeds of over $215,000.

22.     Sameer Gulati ("Gulati") has been the Chief Operating Officer of LendingClub since May 16, 2016.   In that position, he is responsible for LendingClub's operations and corporate strategy.  Gulati sold personally-held LendingClub stock at artificially-inflated prices during the Relevant Period for proceeds of over $1.3 million.

23.     Casey has been the CFO of LendingClub since September 12, 2016.   He was brought in due to his experience at Washington Mutual when it was seized by regulators in 2008. Casey is responsible for overseeing LendingClub's accounting, financial planning and analysis, treasury, tax, and investor relations.   Casey sold personally-held LendingClub stock at artificially-inflated prices during the Relevant Period for proceeds of over $132,000.

24.     Laplanche founded LendingClub in 2007.  He was the CEO and a director of the Company from October 2006 to May 6, 2016, when he resigned from both positions after an internal probe uncovered that LendingClub knowingly sold $22 million of below-grade loans to an investor and that Laplanche had not disclosed his personal stake in an outside investment fund.

25.     Dolan was LendingClub's CFO from August 16, 2010 to August 8, 2016.  During her tenure, she was responsible for LendingClub's financial management and strategy.   She resigned following the events that led to Laplanche's resignation.

26.     John C. Morris ("Morris") has been the chair of LendingClub's board of directors (the "Board") since 2014.  He has been a director since February 2013, and is the chair of the Risk Committee.

27.     Daniel Ciporin ("Ciporin") has been a director of LendingClub since August 2007.  He is the chair of the Compensation Committee and a member of the Audit and Risk Committees.

28.     Ken Denman ("Denman") has been a director of LendingClub since June 2017. He is a member of the Audit and Compensation Committees.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

29.     John Mack ("Mack") has been a director of LendingClub since 2012.  He is the chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

30.     Timothy J. Mayopoulos ("Mayopoulos") has been a director of LendingClub since August 2016.  He is a member of the Audit and Risk Committees.

31.     Patty McCord ("McCord") has been a director of LendingClub since December 2017.  She is a member of the Compensation and Nominating and Corporate Governance Committees.

32.     Defendant Mary Meeker ("Meeker") has been a director of LendingClub since June 2012.  She is a member of the Nominating and Corporate Governance Committee.

33.     Defendant Simon Williams ("Williams") has been a director of LendingClub since November 2014.  He was also previously a director of LendingClub from November 2010 to October 2011.  He is the chair of the Audit Committee and a member of the Risk Committee.

34.     Defendants Sanborn, Allocca, Gulati, Casey, Laplanche, and Dolan are referred to herein as the "Officer Defendants."

35.     Defendants Sanborn, Morris, Ciporin, Denman, Mack, Mayopoulos, McCord, Meeker, and Williams are referred to herein as the "Director Defendants."

36.     Defendants Williams (chair), Ciporin, Denman, and Mayopoulos are referred to herein as the "Audit Committee Defendants."

37.     Defendants Morris (chair), Mayopoulos, and Williams are referred to herein as the "Risk Committee Defendants."

38.     Collectively, defendants Sanborn, Gulati, Casey, Laplanche, Dolan, Morris, Ciporin, Denman, Mack, Mayopoulos, McCord, Meeker, and Williams are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as directors and officers of LendingClub and because of their ability to control its business and corporate affairs, the Individual Defendants owed LendingClub and its stockholders fiduciary obligations of loyalty, good faith, due care,

disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage LendingClub in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LendingClub and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.

40. Each director and officer of the Company owes to LendingClub and its stockholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing. In addition, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's fee consumer structure and compliance with consumer protection laws and regulations, including in the Company's SEC filings.

41. The Individual Defendants, because of their positions of control and authority as directors and officers of LendingClub, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and/or directorial positions with LendingClub, each of the Individual Defendants had access to adverse, nonpublic information about the fee structure, compliance functions, financial condition, operations, and improper representations of LendingClub.

42. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other defendants and of LendingClub, and was at all times acting within the course and scope of such agency.

43. To discharge their duties, the officers and directors of LendingClub were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of LendingClub were required to, among other things:

(a) refrain from acting upon material, inside corporate information to benefit themselves;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(b)     conduct the affairs of the Company in an efficient, business-like manner, to provide the highest performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(c)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations;

(d)     ensure that there were sufficient checks and balances in LendingClub's regulatory and related functions to prevent widespread dissemination of untruthful messages to consumers and investors and/or violation of law; and

(e)     ensure that no inaccurate information about LendingClub was released to the public that would tend to artificially inflate LendingClub's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

44.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LendingClub, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders.  The Individual Defendants were aware, or recklessly disregarded, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants who collectively comprised LendingClub's Board.

45.     Because of their positions with the Company, and their access to material nonpublic information, LendingClub, through the Individual Defendants, knew that the adverse facts detailed herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading.  As a result of the Individual Defendants' illegal actions and course of conduct, the Company, among other things, now is subject to the Securities Class Action and the FTC Complaint alleging violations of federal law.  As a result, LendingClub has expended, and will continue to expend, significant sums of money to defend against these lawsuits.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## SPECIFIC CORPORATE GOVERNANCE
## RESPONSIBILITIES OF THE INDIVIDUAL DEFENDANTS

46.     LendingClub holds itself to specific corporate governance principles beyond the requirements of law.  For example, in its Business Conduct & Ethics Policy (the "Policy"), as revised in July 2017, LendingClub described the duties undertaken by the Board, as well as its officers and employees, as follows:

> All LendingClub directors, officers, and employees are responsible for becoming familiar with our standards of business conduct and ethics to understand their importance to our business.  Employees are responsible for complying with standard operating procedures applicable to their job role and applying the guidance and principles of this policy (and other policies referenced within) whenever your responsibilities may be unclear.  Directors and officers are responsible for adhering to the guidance and principles of this policy (and other policies referred in this policy) whenever acting on behalf of LendingClub. Additionally, directors and officers are ultimately responsible and accountable for establishing an appropriate "tone at the top" to foster a culture of compliance within the company.

47.     Additionally, the Board, or its committees, has the responsibility to:

> [R]eview and update this policy as it deems appropriate, and is responsible for final approval of any material changes.

48.     The Policy is defined, as follows:

> LendingClub operates an online marketplace that *relies on the trust of borrowers, investors, and regulators*.  *Our success depends upon each director, officer, and employee performing their duties in compliance with applicable laws and company policies, standards, and procedures.  It is essential that directors, officers, and employees know and understand the legal and regulatory requirements that apply to our business and to their specific area of responsibility*.  While directors, officers, and employees are not expected to have complete mastery of these laws, rules, and regulations, they are expected to recognize situations that require them to consult with others to determine the appropriate course of action.

> *Legal and regulatory compliance* is only a part of our ethical responsibility, however, and should be *viewed as the minimum acceptable standard of conduct*. LendingClub strives to act with the utmost integrity, not just in its most important corporate decisions, but also in the actions taken every day by its directors, officers, and employees.  Ethical conduct is a high ideal, but often just means exercising common sense and sound judgment.  Acting ethically will help us become a better company, a better commercial partner for other companies, and a better corporate citizen.

(Emphasis added).

49.    The Policy also requires LendingClub's directors and officers to protect confidential information, as follows:

### 5.8. Confidentiality

Confidential information includes all non-public information, regardless of its source, that might be of use to competitors or harmful to the company or its borrowers and investors, if disclosed.  This includes any proprietary information shared with LendingClub by its borrowers, investors, and business partners, or information that has been acquired by a director or an employee during the course of membership on another board of directors or working for a former employer. As a company director or employee, you are obligated to protect against the unauthorized disclosure or misuse of such third-party confidential information. Anyone who has had access to confidential company information must keep it confidential at all times, both while working for the company and after membership on the Board of Directors or employment ends.

### 5.8.1. Sharing Information with Third Parties

*As a director, officer, or employee, you must not share LendingClub's confidential information, or any confidential information of a borrower, investor, service provider, or business partner, with anyone who has not been authorized to receive it, except when disclosure is authorized or legally mandated.  Unauthorized use or distribution of confidential information is serious; it violates the confidentiality agreement you entered into with the company and could be illegal or result in civil liability or criminal penalties.*

### 5.8.2. Precautions

You must take precautions to prevent unauthorized disclosure of confidential information.  Accordingly, you must take steps to ensure that business-related paperwork and documents are produced, copied, scanned, faxed, filed, stored, and discarded in a manner designed to minimize the risk that unauthorized persons may access that information.  Additionally, you may not discuss LendingClub's business in any internet chat room, blog, social media site, or other online forum, regardless of whether you use your own name or a pseudonym, or otherwise post the company's information on the internet, without prior approval in accordance with our Social Media Policy.  All company emails, voicemails, and other communications are presumed confidential and belonging to the company and must not be forwarded or otherwise disseminated outside of the company, except where required for legitimate business purposes.

You are required to observe the provisions of any other specific policy regarding privacy and confidential information that the company may adopt from time to time

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

50.     On March 15, 2017, the Board also approved a set of Corporate Governance Guidelines (the "Guidelines"), which impose additional duties upon the Director Defendants, as follows:

## I.     RESPONSIBILITIES OF THE BOARD OF DIRECTORS

The Board acts as the management team's adviser and monitors management's performance.  The Board is ultimately responsible for oversight of the Company's legal compliance program, which is designed to protect the Company against violations of law or Company policies and procedures, and to assess risks facing the Company and management's approach to addressing such risks.  The Board also reviews and, if appropriate, approves significant transactions and develops standards to be utilized by management in determining the types of transactions that should be submitted to the Board for review and approval or notification.

Each member of the Board is expected to spend the time and effort necessary to properly discharge such director's responsibilities.

51.     Correspondingly, the Charter of LendingClub's Audit Committee specifies that the Committee's purpose is to assist the Board in:

- Overseeing the integrity of the company's financial statements and the company's accounting and financial reporting processes and financial statement audits.

- Overseeing the company's compliance with legal and regulatory requirements.

- Overseeing the registered public accounting firm's (independent auditor's) qualifications and independence.

- Overseeing the performance of the company's independent auditor and internal audit function.

- Overseeing the company's systems of disclosure controls and procedures, internal controls over financial reporting, and compliance with ethical standards adopted by the company.

- Overseeing the evaluation of the effectiveness of the company's internal control over financial reporting and overall governance based on the criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

52.     In addition, the Audit Committee Charter states that "The committee's principal responsibility is one of oversight" and describes the Audit Committee's "Responsibilities and Duties" as follows:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Documents/Reports/Accounting Information Review**

1.    Review this charter at least annually and recommend to the board of directors any necessary amendments.

2.    Evaluate the Committee's composition and performance on an annual basis and submit a report to the Board.

3.    ***Meet with management and the independent auditor to review and discuss the company's annual financial statements and quarterly financial statements (prior to the company's Form 10-K and 10-Q filings or release of earnings)***, including the company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and all internal control reports (or summaries thereof). Review other relevant reports or financial information submitted by the company to any governmental body or the public, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the independent auditor (or summaries thereof).

4.    Discuss earnings press releases, including the type and presentation of information, paying particular attention to any pro forma or adjusted non-GAAP information. Such discussions may be in general terms (*i.e.*, discussion of the types of information to be disclosed and the type of presentations to be made).

5.    Discuss financial information and earnings guidance provided to analysts and ratings agencies. Such discussions may be in general terms (*i.e.*, discussion of the types of information to be disclosed and the type of presentations to be made).

6.    Review the regular internal reports to management (or summaries thereof) prepared by the internal audit function, as well as management's response.

\*       \*       \*

**Financial Reporting Processes, Accounting Policies, and Internal Control Structure**

19.    In consultation with the independent auditor and the internal audit function, review the integrity of the company's financial reporting processes (both internal and external).

20.    Understand the scope of the independent auditors' review of internal control over financial reporting.

21.    Receive and review any disclosure from the company's CEO and CFO made in connection with the certification of the company's quarterly and annual reports filed with the SEC of: a) significant deficiencies and material weaknesses in the design or operation of internal control over

- 13 -

financial reporting that are reasonably likely to adversely affect the company's ability to record, process, summarize, and report financial data; and b) any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal controls.

22.     Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the company's selection or application of accounting principles; major issues as to the adequacy of the company's internal controls; and any special audit steps adopted in light of material control deficiencies.

23.     Review analyses prepared by management and the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

24.     Review the effect of regulatory and accounting initiatives, as well as off-balance-sheet structures, on the financial statements of the. [sic]

25.     Review and approve all related-party transactions in accordance with the company's related party policy and Items 404(a) and (b) of Regulation S-K.  Discuss with the independent auditor its evaluation of the company's identification of, accounting for, and disclosure of its relationships with related parties as set forth under the standards of the PCAOB.

26.     Establish and oversee procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for confidential, anonymous submissions by company employees regarding questionable accounting or auditing matters.

*       *       *

**Ethical Compliance, Legal Compliance, and Risk Management**

32.     ***Review, with the company's counsel, legal compliance and regulatory matters that could have a significant impact on the company's financial statements***.

33.     Discuss policies with respect to risk assessment and risk management, including appropriate guidelines and policies to govern the process, as well as the company's major financial risk exposures and the steps management has undertaken to control them.

34.     Consider the risk of management's ability to override the company's internal controls.

**Reporting**

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

35.   Report regularly to the board regarding the execution of the committee's duties, responsibilities, and activities, as well as any issues encountered and related recommendations.

36.   ***Recommend to the board of directors that the audited financial statements be included in the company's annual report on Form 10-K.***

37.   ***Prepare the committee report to be included in the company's proxy statement as required by the SEC***.

**Other Responsibilities**

38.   Review, with management, the company's finance function, including its budget, organization, and quality of personnel.

39.   Conduct an annual performance assessment relative to the committee's purpose, duties, and responsibilities outlined herein.

40.   Perform any other activities consistent with this charter, the company's bylaws, and governing laws that the board or committee determines are necessary or appropriate.

(Emphasis added).

53.   Similarly, the Charter of LendingClub's Risk Committee specifies that the Committee's purpose is to assist the Board in "its oversight of the Company's management of key risks, including strategic, reputational, credit, liquidity, compliance/legal and operational risks, as well as the guidelines, policies and processes for monitoring and mitigating such risks." The Risk Committee Charter also calls on the Risk Committee's chair, defendant Morris, to coordinate with the Audit Committee's chair, defendant Williams, to assist the Audit Committee in its review of the Company's risks.

54.   The Risk Committee Charter states that the Committee's primary functions are to:

- Provide oversight of the Company's risk management structure;

- ***Provide oversight of the Company's risk management and risk assessment guidelines and policies regarding, strategic, reputational, credit, liquidity, compliance/legal and operational risk and such other risks as appropriate***;

- Provide input and support of the Company's analysis of its risk management structure and entity wide risk tolerance; and

- Monitor the Company's enterprise risk management plan and monitor and evaluate the performance of the Company's risk management function.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Discuss emerging risks that may be applicable to the Company and evaluate potential remediation plans; provide a forum to discuss risk scenarios.

55.    Similar to the Audit Committee, the Risk Committee Charter states that the Committee's risk assessment and risk management responsibility are in the form of "oversight and review."   The Risk Committee's "Responsibilities and Duties" are described in the Risk Committee Charter as follows

**Oversight of Risk Management**

- Review or discuss, as and when appropriate, with management, including the Chief Risk Officer, the Company's risk governance structure and the Company's risk management and risk assessment guidelines and policies regarding strategic, credit, operational (including technology, security, etc.), compliance, and financial risk and the Company's risk tolerance.

- ***Review at least quarterly the major risk exposures of the Company and its business units, including, strategic, credit, operational (technology, security, etc.), compliance and financial risks, against established risk measurement methodologies and the steps management has taken to monitor and control such exposures***.

- Receive (i) reports from the Chief Risk Officer at least quarterly (and other internal departments as necessary to fulfill the Committee's duties and responsibilities) and (ii) reports, as and when appropriate, from the Head of the Internal Audit Department regarding the results of risk management reviews and assessments.

- Review, approve, and monitor the Company's risk appetite and supporting risk tolerance levels.

**Oversight of Risk Tolerance**

- Receive, as and when appropriate, reports and recommendations from management and the Company's internal Management Risk Committee on risk tolerance.  Oversee the Company's process and policies for determining risk tolerances and review management's measurement and comparison of overall risk tolerance to established levels.

**Oversight of Enterprise Risk Management Program**

- Review or discuss, as and when appropriate, the Company's enterprise risk management plans and programs.

**General**

- Make such recommendations to the Board and its committees as the Committee may consider necessary or appropriate and consistent with its purpose, and take such other actions and perform such other services as may be referred to it from time to time by the Board or required under the federal securities laws or rules of any stock exchange on which the Company's equity is listed.

56.     In violation of the Company's Policy, Guidelines, and committee charters, the Individual Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and compliance with federal consumer protection laws.   As such, they have breached their fiduciary duties to the Company.

## SUBSTANTIVE ALLEGATIONS

**Background**

57.     LendingClub is a publicly-traded peer-to-peer lending company incorporated in Delaware.  LendingClub's headquarters are located in San Francisco, California.  It was the first peer-to-peer lender to register its offerings as securities with the SEC and to offer loan trading on a secondary market.  It is currently the world's largest peer-to-peer lending platform, originating nearly $16 billion in loans through December 31, 2015.

58.     Using LendingClub's platform, borrowers can obtain unsecured personal loans ranging between $1,000 and $40,000 with a standard loan period of three or five years. LendingClub makes money by charging borrowers an origination fee and investors a servicing fee.

59.     LendingClub also makes traditional direct to consumer loans, including automobile refinance loans, through WebBank.  These loans are not funded by investors and are instead funded by other financial institutions.

60.     LendingClub was founded by defendant Laplanche and initially launched on Facebook as one of the first Facebook applications.   In October 2008, LendingClub began registering its loans as securities with the SEC.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

61.     The Company went public in 2014, and continued to expand into car loans and partnerships with e-commerce players such as Google, Alibaba, BancAlliance, and HomeAdvisor.

62.     In early 2016, LendingClub was experiencing difficulty attracting investors.  This caused the Company to increase its interest rates on borrowers three times during the first quarter of 2016, and caused a large stock decline.  Then, in April 2016, an employee reported to Laplanche that the dates on approximately $3 million in loans appeared to have been altered. The Company engaged an outside auditor to investigate the issues, who found much more deeply-rooted problems.  It was eventually uncovered that $22 million in loans that had been sold to Jefferies Group LLC, an investment bank, did not meet the bank's investment criteria. LendingClub was forced to buy the loans back.  The investigation also found that Laplanche had not disclosed to the Board that he owned part of an investment fund that LendingClub was considering purchasing.   In addition to the damage to corporate goodwill, these schemes eventually subjected the Company to a securities class action, captioned *In re LendingClub Securities Litigation*, No. 3:16-cv-2627 (N.D. Cal), which recently settled for $125 million.

63.     In the aftermath of these earlier fraudulent schemes, the Company attempted to take action to right itself.  The Company's CEO and CFO, defendants Laplanche and Dolan, were removed, along with several directors, and a new slate of executives was brought in with the stated purpose of cleaning up the Company and improving its compliance and transparency moving forward.

64.     Despite defendants Sanborn, Allocca, Gulati, and Casey being brought in to turn the Company around, LendingClub's pattern of false statements to investors and customers has continued.

**The Fraudulent Schemes**

65.     Throughout the Relevant Period, the Individual Defendants caused LendingClub to lure borrowers to its website with its claim of "no hidden fees."  Once those borrowers went through the process of obtaining a loan, their loan proceeds would be hundreds or thousands of dollars less than expected due to the deduction of hidden upfront fees.  The "no hidden fees"

1   claim was ever-present in advertisements, the loan application interface, and in SEC filings, yet
2   it was fundamentally untrue.

3       66.    The "no hidden fees" claim showed up in a variety of ways:

4       • Mail advertisements that stated, "**FEES**: There are no hidden fees or
5         prepayment penalties;"

6       • Mail advertisements that prominently stated, "**No hidden fees or prepayment**
7         **penalties**," directly underneath a large, colorful exclamation point;

8       • Online banner advertisements that touted "no hidden fees;"

9       • Paid blog posts that stated "no hidden fees"; and

10      • When a customer took the first steps toward applying for a loan, the only
11        disclosure of fees was a graphic of a smiley face and the words "no hidden
12        fees."

13      67.    LendingClub's interface was designed to prominently display the claim of "no
14  hidden fees," while making it extremely difficult to view the true fee disclosures.  These were
15  often hidden in small links that led to pop-up windows or were below the first page displayed on
16  the interface.  The pervasiveness of the "no hidden fee" claim shows that it had to be known by
17  all of the Individual Defendants, particularly the members of the Risk Committee.

18      68.    Throughout the Relevant Period, the Individual Defendants also caused
19  LendingClub to misrepresent to customers that their loan applications had been approved, when
20  they had not and likely would not.  This scheme worked by sending emails to customers stating
21  that "Your Loan is 100% Backed" and "Great news! Investors have backed your loan 100%.
22  Your money is almost in your hand.  You can always visit your Account Summary to view the
23  details of your loan.  Welcome to Lending Club!" after they had filled out the initial application
24  and garnered investor funding, long before the application had gone through the more rigorous
25  "back-end" review of their application by LendingClub.

26      69.    These misleading practices hurt consumers in two ways.  First, many consumers
27  who received these messages were subsequently rejected by LendingClub's "back-end" credit
28  and background check and never received a loan.  Of approximately 196,000 consumer who

1   received these messages, 43,000 were subsequently rejected.  Second, these misleading messages

2   caused many consumers to miss opportunities for credit from other institutions because they

3   relied upon LendingClub's misleading statements.

4          70.     Customers mistakenly believing their loans were approved was such a widespread

5   issue that answering questions regarding it was a fundamental part of LendingClub's customer

6   representative training materials.  "What does this mean? I thought I was approved" was a

7   commonly asked question that customer service representatives were trained to answer.  Given

8   that LendingClub primarily functions by issuing loans to consumers, the Individual Defendants

9   knew or should have known about this practice, yet failed to correct it.

10         71.     Another abusive scheme that the Company carried out throughout the Relevant

11   Period involved regularly making unauthorized and improper electronic bank account

12   withdrawals from borrowers.  These included double charges without authorization, automatic

13   withdrawals after customers had opted out, and automatic withdrawals after loans had been

14   repaid.  Further, the Company failed to provide adequate notice of these withdrawals to

15   customers, who would not learn of the withdrawals until they saw them on their bank statements.

16   This improper practice again would fall under the purview of all of the Individual Defendants

17   and specifically the Risk Committee.

18         72.     As explained above, LendingClub is subject to the GLBA and must protect

19   nonpublic personal information, such as Social Security numbers and bank routing information.

20   Throughout the Relevant Period, LendingClub failed to deliver the initial privacy notice to each

21   customer as a necessary step to obtaining a loan.  Instead, the Individual Defendants allowed

22   LendingClub to merely require customers to agree to its Terms of Use, which itself only included

23   a link to its privacy policy.  To review the statutorily-required privacy notice, a borrower was

24   required to click a link that did not indicate it was related to privacy and then click yet another

25   link to LendingClub's privacy policy.  This was far short of the GLBA's required "clear and

26   conspicuous" privacy notice.

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**IMPROPER STATEMENTS**

73.     LendingClub's primary product is installment loans offered through its marketplace.  The Individual Defendants repeatedly caused the Company to tell consumers that its loans featured a fixed interest rate that was "clearly" disclosed to the borrower and contained "no hidden fees."  In truth this was not correct and throughout the Relevant Period the Individual Defendants caused LendingClub to file such false statements with the SEC.

74.     On February 27, 2015, the Individual Defendants caused LendingClub to file its annual report on Form 10-K for the year ended December 31, 2014 (the "2014 10-K") with the SEC.  The 2014 10-K purported to provide the Company's annual financial results.  The 2014 10-K was signed by defendants Laplanche and Dolan.  The 2014 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Laplanche and Dolan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  The 2014 10-K stated that the Company believed all installment loans offered through its marketplace featured a fixed rate, which was "clearly" disclosed to the borrower and contained "no hidden fees," stating in relevant part:

> We believe that our marketplace provides the following benefits to borrowers:
>
> - ***Access to Affordable Credit***.  Our innovative marketplace model, online delivery and process automation enable us to offer borrowers interest rates that are generally lower on average than the rates charged by traditional banks, credit cards or installment loans.
>
> - ***Superior Borrower Experience***.  We offer a fast and easy-to-use online application process and provide borrowers with access to live support and online tools throughout the process and over the life of the loan.
>
> - ***Transparency and Fairness.  All of the installment loans offered through our marketplace feature a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty***.  Our platform utilizes a computerized, rules- based engine for credit decisioning, which removes the human bias associated with reviewing applications.

- ***Fast and Efficient Decisioning***.  We leverage online data and technology to quickly assess risk, determine a credit rating and assign appropriate interest rates quickly.

(Emphasis added).

75.     The 2014 10-K also stated that the Company had a detailed privacy policy, which complied with the GLBA, as follows:

*Privacy and Data Security Laws*.  The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. ***We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website.  We maintain consumers' personal information securely, and we do not sell, rent or share such information with third parties for marketing purposes unless previously agreed to by the consumer*.  *In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information*.**

(Emphasis added).

76.     The same false public statements continued the next year when the Individual Defendants caused LendingClub to file its Form 10-K for the year ended December 31, 2015 with the SEC on February 22, 2016 (the "2015 10-K").  The 2015 10-K was signed by defendants Laplanche and Dolan.  The 2015 10-K contained signed SOX certifications by defendants Laplanche and Dolan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.  The 2015 10-K again stated that the Company believed that all installment loans offered through its marketplace featured a fixed rate that was "clearly" disclosed to the borrower and contained "no hidden fees," as follows:

We believe that our marketplace provides the following benefits to borrowers:

- ***Access to Affordable Credit***.  Our innovative marketplace model, online delivery and process automation enable us to offer borrowers interest rates that are generally lower on average than the rates charged by traditional banks, credit cards or installment loans.

- 22 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- • ***Superior Borrower Experience***.   We offer a fast and easy-to-use online application process and provide borrowers with access to live support and online tools throughout the process and over the life of the loan.

- • ***Transparency and Fairness***.   The installment loans offered through our marketplace feature a ***fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty***.   Small business lines of credit have rates based upon the prime rate and allow borrowers to draw in increments, reducing their interest cost.   Our platform utilizes an automated, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.

(Emphasis added).

77.   The 2015 10-K also stated that the Company had a detailed privacy policy, which complied with the GLBA, as follows:

*Privacy and Data Security Laws*.   The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. ***We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website.   We maintain consumers' personal information securely, and we do not sell, rent or share such information with third parties for marketing purposes unless previously agreed to by the consumer.   In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information***.

(Emphasis added).

78.   On February 28, 2017, the Individual Defendants caused LendingClub to file its annual report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC.   The 2016 10-K was signed by defendants Sanborn and Casey.   The 2016 10-K contained signed SOX certifications by defendants Sanborn and Casey attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.   The 2016 10-K stated, in a similar fashion to its predecessors, that the Company believed all installment loans offered through its marketplace

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

featured a fixed rate that was "clearly" disclosed to the borrower and contained "no hidden fees,"

by stating in relevant part:

> We believe that our marketplace provides the following benefits to borrowers:
>
> - **Access to Affordable Credit**.  Our innovative marketplace model, online delivery and process automation enable us to offer borrowers interest rates that are generally lower on average than the rates charged by traditional banks, credit cards or installment loans.
>
> - **Superior Borrower Experience**.  We offer a fast and easy-to-use online application process and provide borrowers with access to live support and online tools throughout the process and over the life of the loan.
>
> - **Transparency and Fairness**.  The installment loans offered through our marketplace feature a ***fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, no hidden fees and the ability to prepay the balance at any time without penalty.***  Small business lines of credit have rates based upon the prime rate and allow borrowers to draw in increments, reducing their interest cost.  Our platform utilizes an automated, rules-based engine for credit decisioning, which removes the human bias associated with reviewing applications.
>
> - **Fast and Efficient Decisioning.**  We leverage online data and technology to quickly assess risk, detect fraud, determine a credit rating and assign appropriate interest rates quickly.

(Emphasis added).

79.     The 2016 10-K also stated that the Company had a detailed privacy policy, which complied with the GLBA, as follows:

> *Privacy and Data Security Laws*.  The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information, and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. ***We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website. We maintain consumers' personal information securely, and only share such information with third parties for marketing purposes in accordance with our privacy policy and with the consent of the consumer. In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information***.

- 24 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(Emphasis added).

80.    Most recently, on February 22, 2018, the Individual Defendants caused LendingClub to file its annual report on Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC.  The 2017 10-K was signed by defendants Sanborn and Casey and contained signed SOX certifications by defendants Sanborn and Casey attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.  The 2017 10-K stated that the Company believed all installment loans offered through its marketplace featured a fixed rate that was "clearly" disclosed to the borrower and contained "no hidden fees," as follows:

> We believe that our lending marketplace provides the following benefits to borrowers:
>
> - **Access to Affordable Credit.**  Our proprietary lending marketplace model, easily accessible online delivery and process automation enable us to offer a wide range of borrowers interest rates that are lower on average than the rates charged by banks for credit cards, and make us highly competitive within the lending marketplace space for installment loans.
>
> - **Superior Borrower Experience.**  We offer a fast and easy-to-use online application process and provide borrowers with access to live support and online tools throughout the process and over the life of the loan.
>
> - **Transparency**.  The installment loans facilitated through our lending marketplace feature *a fixed rate that is clearly disclosed to the borrower during the application process, with fixed monthly payments, an origination fee and the ability to prepay the balance at any time without penalty*.  Our platform utilizes an automated, rules-based engine for applying the underwriting standards of the related issuing bank partner to an application and income verification, which significantly reduces the human bias associated with reviewing applications.
>
> - **Fast and Efficient Decisioning**.  We leverage online data and technology to assess risk, detect fraud, determine a credit rating and assign appropriate interest rates quickly.

(Emphasis added).

81.    The 2017 10-K also stated that the Company had a detailed privacy policy, which complied with the GLBA, as follows:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*Privacy and Data Security Laws.* The federal Gramm-Leach-Bliley Act (GLBA) includes limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances requires financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information, and requires financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information. ***We have a detailed privacy policy, which complies with GLBA and is accessible from every page of our website. We maintain consumers' personal information securely, and only share such information with third parties for marketing purposes in accordance with our privacy policy and with the consent of the consumer. In addition, we take measures to safeguard the personal information of our borrowers and investors and protect against unauthorized access to this information.***

(Emphasis added).

82.     The statements referenced in ¶¶ 74-81 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to the Individual Defendants or recklessly disregarded by them.   Specifically, the Individual Defendants made false and/or misleading statements and/or failed to disclose that: (1) LendingClub falsely promised consumers they would receive a loan with "no hidden fees" when each loan contained substantial upfront hidden fees; (2) LendingClub did not adequately protect customers' private data in violation of the GLBA; (3) consequently, the foregoing conduct would subject LendingClub to heightened regulatory scrutiny by the FTC; and (4) as a result, the Individual Defendants' public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH IS REVEALED

83.     On April 25, 2018, the FTC issued a press release announcing that it had filed a complaint against LendingClub alleging violations of, *inter alia*, the FTC Act, for falsely promising borrowers that they would receive a loan with "no hidden fees," and the GLBA, for failing to provide consumers with a clear and conspicuous privacy notice so that each consumer could reasonably be expected to receive actual notice.   The FTC's press release stated, in relevant part:

**FTC Charges Lending Club with Deceiving Consumers**
**Defendant promises "no hidden fees" but charges them anyway**

April 25, 2018

*The Federal Trade Commission has charged the LendingClub Corporation with falsely promising consumers they would receive a loan with "no hidden fees," when, in actuality, the company deducted hundreds or even thousands of dollars in hidden up-front fees from the loans.*

"This case demonstrates the importance to consumers of having truthful information from lenders, including online marketplace lenders," said Reilly Dolan, acting director of the FTC's Bureau of Consumer Protection. "Stopping this kind of conduct will help consumers make informed choices about loan offers."

As stated in the FTC's complaint, *Lending Club recognized that its hidden fee was a significant problem for consumers, and an internal review noted that its claims about the fee and the amount consumers would receive "could be perceived as deceptive as it is likely to mislead the consumer." An attorney for one of the company's largest investors also warned the company that the "relative obscurity" of the up-front fee in light of the company's prominent "no hidden fees" representation could make the company a target for a law enforcement action.*

According to the FTC, *Lending Club ignored these and other warnings and, over time, made its deceptive "no hidden fees" claim even more prominent.*

The FTC also alleges that Lending Club falsely told loan applicants that "Investors Have Backed Your Loan" while knowing that many of them would never get a loan, a practice that delayed applicants from seeking loans elsewhere. In addition, in numerous instances, Lending Club has withdrawn double payments from consumers' accounts and has continued to charge those who cancelled automatic payments or paid off their loans, which costs consumers overdraft fees and prevents them from making other payments. *In addition, Lending Club failed to get consumers' acknowledgment of its information-sharing policy as required by law.*

*The company is charged with violating the FTC Act and the Gramm-Leach-Bliley Act.*

(Emphasis added).

84.    As alleged in the FTC Complaint, the Individual Defendants caused the Company to act in violation of the GLBA due to, *inter alia*, their failure to deliver the initial privacy notice so that each consumer could reasonably be expected to receive actual notice.   The FTC Complaint states, in relevant part:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

47.     The Privacy Rule, which implements Sections 501-503 of the [Gramm-Leach-Bliley] Act, 15 U.S.C. §§ 6801-6803, was promulgated by the Federal Trade Commission on May 24, 2000, and became effective on July 1, 2001.  16 C.F.R. Part 313.  Since the enactment of the Dodd-Frank Act on July 21, 2010, the Consumer Financial Protection Bureau ("CFPB") became responsible for implementing the Privacy Rule, and promulgated the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. Part 1016 ("Reg. P"), which became effective on October 28, 2014. Defendant's conduct is governed by the Privacy Rule prior to October 28, 2014, and by Reg. P after that date.  The GLB Act authorizes both the CFPB and the Federal Trade Commission to enforce Reg. P.  15 U.S.C. § 6805.

48.     Both the Privacy Rule and Reg. P require financial institutions to provide consumers with an initial and annual privacy notice.  Both the initial and annual privacy notices must be "clear and conspicuous," 16 C.F.R. § 313.3(b) and 12 C.F.R. § 1016.3(b), and must "accurately reflect[] [the financial institution's] privacy policies and practices."  16 C.F.R. §§ 313.4 and 313.5 and 12 C.F.R. §§ 1016.4 and 1016.5.  The privacy notice must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the security and confidentiality policies of the financial institution.  16 C.F.R. § 313.6; 12 C.F.R. § 1016.6.  A financial institution must provide its privacy notice so that each consumer can reasonably be expected to receive actual notice.  16 C.F.R. § 313.9; 12 C.F.R. § 1016.9.  For consumers who conduct transactions electronically, a consumer can "reasonably be expected to receive actual notice" if he or she acknowledges receipt of the notice as a necessary step to obtaining the financial product or service.  16 C.F.R. § 313.9; 12 C.F.R. § 1016.9; Privacy of Consumer Financial Information, 65 Fed. Reg. 33646-01, at 33665-66 (May 24, 2000).

49.     Defendant failed to comply with the requirements of the Privacy Rule and Reg. P.  Specifically, Defendant failed to deliver the initial privacy notice so that each customer can reasonably be expected to receive actual notice.  16 C.F.R. § 313.9; 12 C.F.R. § 1016.9.  For example, until at least the end of 2016, Defendant did not require customers to acknowledge receipt of the notice as a necessary step to obtaining a particular financial product or service.  16 C.F.R. § 313.9, and Reg. P, 12 C.F.R. § 1016.9.  Instead, Defendant required customers to agree only to Defendant's Terms of Use, which itself included only a link to Defendant's privacy policy.  In order to reach the privacy notice that Defendant was required to provide to customers, a customer would need to click on a link that did not indicate it was related to privacy, and then further find a link to Defendant's privacy policy within the lengthy document to which the link led.  Customers were not provided a clear and conspicuous privacy notice before they submitted nonpublic personal information to Defendant.

85.     The FTC Complaint formally charges LendingClub with violations of the GLBA, as follows:

**Count IV**
**VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT ("GLB Act")**
**PRIVACY RULE AND REG. P**

63.     As described in Paragraph 48, the Privacy Rule and Reg. P require financial institutions to provide customers with a clear and conspicuous privacy notice that accurately reflects the financial institution's privacy policies and practices.  Further, financial institutions must deliver the privacy notice so that each customer could reasonably be expected to receive actual notice.

64.     Defendant is a financial institution, as defined in Section 509(3)(A) of the GLB Act, 15 U.S.C. § 6809(3)(A).

65.     As set forth in Paragraph 49, Defendant failed to deliver the initial privacy notice so that each customer could reasonably be expected to receive actual notice.  Therefore Defendant violated the Privacy Rule, 16 C.F.R. § 313.9, and Regulation P, 12 C.F.R. § 1016.9.

86.     Following this news, LendingClub's share price declined more than 15% on April 25, 2018, wiping out over $205 million in market capitalization.

**FALSE AND MISLEADING PROXY STATEMENTS**

87.     In addition to the lack of internal controls and failure to act, which caused the Company to fail to comply with federal law and issue false and misleading statements relating thereto, the Individual Defendants likewise caused the Company to issue false and misleading proxy statements, which sought stockholder votes for, *inter alia*, director reelection and executive compensation policies.

88.     On April 24, 2015, the Individual Defendants caused LendingClub to file with the SEC and disseminate to stockholders a Proxy Statement on form DEF 14A (the "2015 Proxy") in connection with the Company's annual stockholder meeting.  The Individual Defendants drafted, approved, reviewed, and/or signed the 2015 Proxy before it was filed with the SEC and disseminated to LendingClub's stockholders.   The Individual Defendants knew, or were deliberately reckless in not knowing, that the 2015 Proxy was materially false and misleading.

89.     Among other things, the 2015 Proxy sought stockholder approval for the re-election of two directors, each to serve another three-year term.

90.     On April 26, 2016, the Individual Defendants caused LendingClub to file with the SEC and disseminate to stockholders a Proxy Statement on form DEF 14A (the "2016 Proxy") in

1   connection with the Company's annual stockholder meeting.  The Individual Defendants drafted,

2   approved, reviewed, and/or signed the 2016 Proxy before it was filed with the SEC and

3   disseminated to LendingClub's stockholders.   The Individual Defendants knew, or were

4   deliberately reckless in not knowing, that the 2016 Proxy was materially false and misleading.

5       91.   Among other things, the 2016 Proxy sought stockholder approval for the re-

6   election of three Director Defendants, each to serve a three-year term.

7       92.   On April 24, 2017, the Individual Defendants caused LendingClub to file with the

8   SEC and disseminate to stockholders a Proxy Statement on form DEF 14A (the "2017 Proxy") in

9   connection with the Company's annual stockholder meeting.  The Individual Defendants drafted,

10  approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and

11  disseminated to LendingClub's stockholders.   The Individual Defendants knew, or were

12  deliberately reckless in not knowing, that the 2017 Proxy was materially false and misleading.

13      93.   Among other things, the 2017 Proxy sought stockholder approval for the re-

14  election of three directors, each to serve a three-year term.

15      94.   With respect to the compensation of the Company's executives, the 2017 Proxy

16  set forth to LendingClub stockholders that at least a portion of the Company's executive

17  compensation going forward would be performance based.  The 2017 Proxy solicited an advisory

18  vote on this new "pay-for-performance" plan, which was to include performance-based stock

19  awards in 2017.

20      95.   On April 17, 2018, the Individual Defendants caused LendingClub to file with the

21  SEC and disseminate to stockholders a Proxy Statement on Form DEF 14A (the "2018 Proxy")

22  in connection with the Company's annual stockholder meeting.   The Individual Defendants

23  drafted, approved, reviewed, and/or signed the 2018 Proxy before it was filed with the SEC and

24  disseminated to LendingClub's stockholders.   The Individual Defendants knew, or were

25  deliberately reckless in not knowing, that the 2018 Proxy was materially false and misleading.

26      96.   Among other things, the 2018 Proxy sought stockholder approval for the re-

27  election of four Director Defendants, each to serve a three-year term.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

97.     With respect to the compensation of the Company's executives, the 2018 Proxy set forth to LendingClub stockholders that at least a portion of the Company's executive compensation was performance based.  As noted in the 2018 Proxy, this incentive-based compensation came in the form of performance-based restricted stock units in 2017.

98.     The Exchange Act requires publicly-traded companies to disclose all "material information" to stockholders.  In the 2015-2018 Proxies, the Individual Defendants failed to disclose that LendingClub did not disclose hidden fees to borrowers and was in violation of the GLBA.   When the 2015-2018 Proxies were issued, the Individual Defendants knew of LendingClub's violations of federal consumer protection laws and the false and misleading statements they had caused the Company to issue related thereto.  Yet, they failed to disclose these facts in violation of the Exchange Act.

99.     Accordingly, the 2015-2018 Proxies as set forth above were false and misleading when filed.

### INSIDER TRADING ALLEGATIONS

100.     While in possession of knowledge that LendingClub was misleading customers and investors regarding its fee structure and consumer protection compliance, defendants Sanborn, Allocca, Gulati, Casey, and Williams sold large quantities of their personal holdings of LendingClub shares at inflated prices totaling over $5 million prior to the truth coming to light.

101.     Defendant Sanborn is LendingClub's CEO.  He was appointed to the role in June 2016, with the stated goal of "transforming the company and bringing a heightened degree of transparency and disciplined growth to LendingClub operations."  Rather that achieve that goal, he used his access to material, adverse, and non-public information regarding LendingClub's customer disclosure policies and non-compliance with federal law to sell 294,276 shares of LendingClub stock between August 15, 2016 and November 13, 2017, at artificially-inflated prices, for proceeds of $1,680,539.68.

102.     Defendant Allocca has been LendingClub's President since May 16, 2017.  Prior to joining the Company, he had two decades of fintech and financial services leadership experience.  As President and with his extensive background in the field, Allocca was aware of

1   the value of the material, adverse, and non-public information to which he had access.  While in

2   possession of this information, Allocca sold 35,378 shares of LendingClub stock on August 28,

3   2017, at artificially-inflated prices, for proceeds of $215,289.28.

4   103.   Defendant Gulati has been LendingClub's Chief Operations Officer since May

5   16, 2016.  In that role, he is responsible for the Company's operations and corporate strategy.

6   Gulati was aware of material, adverse, and non-public information regarding LendingClub's

7   customer disclosure policies and compliance with federal law.   While in possession of this

8   information, Gulati sold 243,237 shares of LendingClub stock between June 27, 2016 and

9   October 26, 2017, at artificially-inflated prices, for proceeds of $1,363,208.18.

10   104.   Defendant Casey has been LendingClub's CFO since September 12, 2016.  In that

11   role, he is responsible for overseeing accounting, financial planning and analysis, treasury, tax,

12   and investor relations.   Casey was aware of material, adverse, and non-public information

13   regarding LendingClub's customer disclosure policies and compliance with federal law.  While

14   in possession of this information, Casey sold 22,766 shares of LendingClub stock between

15   November 28, 2016 and August 28, 2017, at artificially-inflated prices, for proceeds of

16   $132,788.11.

17   105.   Defendant Williams has been a director of LendingClub since November 2014,

18   with an earlier stint as a director from November 2010 to October 2011.  Additionally, he is the

19   chairman of the Audit Committee and a member of the Risk Committee.  With this history and

20   these committee roles, he had intimate access to material, adverse, and non-public information

21   regarding LendingClub's customer disclosure policies and compliance with federal law.  While

22   in possession of this information, Williams sold 330,000 shares of LendingClub stock between

23   March 1, 2017 and May 10, 2017, at artificially-inflated prices, for proceeds of $1,791,362.

24   106.   Rather than providing the market with accurate information, defendants Sanborn,

25   Allocca, Gulati, Casey, and Williams used their knowledge of LendingClub's material nonpublic

26   information to dispose of millions of dollars' worth of their Company stock at a time when

27   LendingClub's stock price was artificially inflated by the improper statements.  These insider

28

1   sales totaled over $5.18 million and were all executed while LendingClub's stock price was

2   artificially inflated due to the unlawful conduct alleged herein.

3   **DAMAGES TO LENDINGCLUB**

4   107.   These acts and omissions have caused significant injury to LendingClub for

5   which the Individual Defendants should be held personally liable.   Aside from harming the

6   Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have

7   exposed the Company to legal costs to defend, investigate, and pay judgment or settlements in

8   multiple lawsuits, including the following.

9   108.   On April 25, 2018, the FTC filed the FTC Complaint alleging violations of

10   federal consumer protection statutes.   The FTC Complaint alleges that LendingClub violated the

11   FTC Act by: promising potential borrowers "no hidden fees" and then charging large hidden

12   fees; telling borrowers their loans were approved when in truth it had not yet been funded;

13   making unauthorized electronic bank account withdrawals from borrowers; and failing to

14   provide required privacy notices to borrowers in violation of the GLBA.   The FTC Complaint

15   alleges four counts:  (1) deception in the up-front fee; (2) deception in certainty of loan approval;

16   (3) unfairness in unauthorized charges; and (4) violations of the GLBA.

17   109.   On May 2, 2018, the Securities Class Action was filed in the Northern District of

18   California alleging that the Company, defendants Laplanche, Sanborn, Dolan, and Casey, and

19   non-defendant Coleman (collectively, the "Securities Class Action Defendants") violated federal

20   securities laws by issuing false and misleading statements to the investing public.   The Securities

21   Class Action alleges that between February 28, 2015 and April 25, 2018, inclusive, the Securities

22   Class Action Defendants engaged in a fraudulent scheme and course of conduct designed to hide

23   hidden fees and compliance with federal law.

24   110.   As a direct and proximate result of the Individual Defendants' actions as alleged

25   herein, LendingClub's market capitalization declined more than $205 million after the truth was

26   revealed.

27   111.   Moreover, these actions have irreparably damaged LendingClub's corporate

28   image and goodwill.   Borrowers will not rate LendingClub as highly now that the Company has

- 33 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

been outed for its deceptive practices. For at least the foreseeable future, LendingClub will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that LendingClub's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

112.    Plaintiff brings this action derivatively in the right and for the benefit of LendingClub to redress injuries suffered by the Company as a direct result of the violations of state law, including breaches of fiduciary duty, corporate waste, and unjust enrichment, and violations of federal law, including Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, the FTC Act, and the GLBA, by the Individual Defendants.

113.    LendingClub is named as a nominal defendant solely in a derivative capacity. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack. Plaintiff was a stockholder of LendingClub at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current LendingClub stockholder. Plaintiff will adequately and fairly represent the interests of similarly-situated LendingClub stockholders in enforcing and prosecuting the Company's rights. Prosecution of this action, independent of the current Board, is in the best interests of the Company.

114.    Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be futile and useless because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

115.    The current LendingClub Board consists of the following ten individuals: defendants Sanborn, Morris, Ciporin, Denman, Mack, Mayopoulos, McCord, Meeker, and Williams, as well as non-defendant Susan Athey.[1]

---

[1]  Ms. Athey was appointed to the Board on March 22, 2018.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

116.    As an initial matter, defendant Sanborn is independently incapable of objectively considering pre-suit demand to bring these claims, since he is the current CEO of LendingClub, receiving extensive salary and other compensation (over $6.7 million in 2017), and thus depends upon his position for his livelihood.  Accordingly, defendant Sanborn lacks independence due to his interest in maintaining his executive position at LendingClub.  Moreover, defendant Sanborn is incapable of considering a demand to commence and prosecute this action because he faces additional substantial liability as a named defendant in the Securities Class Action.  Also, the Company concedes that defendant Sanborn is not independent by omitting him from the list of Board members considered to be independent under the applicable rules, regulations, and listing standards of the New York Stock Exchange.

117.    In fact, all nine of the Director Defendants are conflicted due to their tenure during the class period in the Securities Class Action.  The Director Defendants either directly approved of or allowed the Company to issue the false and misleading statements at the heart of the Securities Class Action and if the Board were to bring the claims at issue here, it would be tantamount to admitting liability in the Securities Class Action.  If the Company presses forward with its rights of action in this case, then the Company's efforts would undercut or even compromise the defense of the that case, making demand futile.  The Director Defendants are therefore incapable of disinterestedly and independently considering a demand to investigate, commence, or vigorously prosecute this action.

118.    The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the misstatements and customer deception scheme, and as such had a fiduciary duty to ensure that the Company complied with the law and that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

119.    Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented

- 35 -

1   effectively), and to ensure that the Board's duties were being discharged in good faith and with

2   the required diligence and due care.  Instead, they knowingly and/or with reckless disregard

3   reviewed, authorized, and/or caused the publication of the materially false and misleading 2015-

4   2018 Proxies discussed above.

5   120.   The Director Defendants' making or authorization of the false and misleading

6   2015-2018 Proxies, failure to timely correct the statements therein, failure to take necessary and

7   appropriate steps to ensure that the Company's internal controls were sufficiently robust and

8   effective (and/or were being implemented effectively), and failure to take necessary and

9   appropriate steps to ensure that the Board's duties were being discharged in good faith and with

10   the required diligence constitute breaches of fiduciary duties for which the Director Defendants

11   face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf

12   of LendingClub to recover damages sustained as a result of this misconduct, they would expose

13   themselves to significant liability.  This is something they will not do.  For this reason, demand is

14   futile.

15   121.   The Audit Committee Defendants – Williams (chair), Ciporin, Denman, and

16   Mayopoulos – were responsible for, among other things, reviewing and approving quarterly and

17   annual financial statements, overseeing LendingClub's internal controls over financial reporting,

18   and discharging their other duties as described herein.  Despite these duties, the Audit Committee

19   Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence

20   and reasonable care in reviewing and preventing, the dissemination of false and/or materially

21   misleading annual reports and proxy statements and failed in their specific duties to ensure that

22   the Company's internal controls over financial reporting were sufficient and that statements

23   made by the Company regarding its business, operations, prospects, and internal controls were

24   accurate.   Accordingly, the Audit Committee Defendants face a sufficiently substantial

25   likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand

26   upon the Audit Committee Defendants therefore is futile.

27   122.   The Risk Committee Defendants – Morris (chair), Mayopoulos, and Williams –

28   were responsible for, among other things, overseeing the Company's key risks, including

- 36 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1   strategic, reputational, compliance/legal, and operational risks, as well as the guidelines, policies

2   and processes for monitoring and mitigating such risks.   Despite these duties, the Risk

3   Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due

4   diligence and reasonable care in reviewing and preventing, the dissemination of false and/or

5   materially misleading annual reports, proxy statements, marketing materials, customer interfaces,

6   loan applications, and loan procedures and failed in their specific duties to ensure that the

7   Company's internal controls over compliance matters were sufficient.   Accordingly, the Risk

8   Committee Defendants face a sufficiently substantial likelihood of liability for breach of their

9   fiduciary duties of loyalty and good faith.   Any demand upon the Risk Committee Defendants

10  therefore is futile.

11        123.    Demand is futile as to defendants Sanborn and Williams due to their illegally

12  profiting from insider sales.   Defendants Sanborn and Williams not only disseminated the false

13  and misleading statements complained of herein, but with knowledge that the false and

14  misleading statements were causing LendingClub stock to trade at artificially-inflated prices.   As

15  such, defendants Sanborn and Williams received a financial benefit not shared by other

16  LendingClub stockholders.   Accordingly, demand is futile as to defendants Sanborn and

17  Williams.

18        124.    Plaintiff has not made any demand on stockholders of LendingClub to institute

19  this action since such demand would be a futile and useless act for the following reasons:

20            (a)     LendingClub is a publicly traded company with more than 419 million

21  common shares outstanding, held by hundreds or thousands of stockholders;

22            (b)     making a demand on such a number of stockholders would be impossible

23  for Plaintiff who has no way of finding out the names, addresses, or phone numbers of

24  stockholders; and

25            (c)     making demand on all stockholders would force Plaintiff to incur

26  excessive expenses, assuming all stockholders could be individually identified.

27        125.    If LendingClub's officers and directors are protected against personal liability for

28  their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by LendingClub against the Individual Defendants, known as the "insured versus insured exclusion."

126.   As a result, if the Director Defendants were to sue themselves or certain of the officers of LendingClub, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

127.   Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting LendingClub by prosecuting this action.  Therefore, demand on LendingClub and its Board is futile and is excused.

128.   LendingClub has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Section 14(a) of the Exchange Act and SEC Rule 14a-9
### (Against the Individual Defendants)

129.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except any allegation related to fraud, if any.

130.   SEC Rule 14a-9, promulgated pursuant to section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light

of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's 2015-2018 Proxies violated section 14(a) of the Exchange Act and SEC Rule 14a-9 because they neglected to mention material information concerning the Company's deceptive practices and compliance failures.

131.    The 2015-2018 Proxies were false and misleading when issued because they failed to disclose (among other things) the truth about the Company's deceptive practices and compliance failures.

132.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2015-2018 Proxies were materially false and misleading.

133.    The misrepresentations and omissions in the 2015-2018 Proxies were material to Company stockholders in voting on the matters set forth for stockholder ratification in the 2015-2018 Proxies.  The 2015-2018 Proxies were an essential link in the accomplishment of the continuation of these defendants' continued violation of their fiduciary duties.

134.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015-2018 Proxies.

## COUNT II

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    The Individual Defendants owed and owe LendingClub fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe LendingClub the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

137.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

138.    The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.   The Individual Defendants also each knowingly, recklessly, or negligently approved the scheme described herein to deceive consumers.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, LendingClub has sustained significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

## COUNT III

### Waste of Corporate Assets
### (Against the Individual Defendants)

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    The wrongful conduct alleged regarding the deceptive scheme and the issuance of false and misleading statements, was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

143.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

144.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

145.    Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**COUNT IV**

**Misappropriation of Information and Insider Stock Sales**
**(Against Sanborn, Allocca, Gulati, Casey, and Williams)**

146. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147. At the time of each of the stock sales set forth herein, defendants Sanborn, Allocca, Gulati, Casey, and Williams knew, but did not disclose publicly, that the Company was engaging in a scheme to deceive its loan customers and issuing false and misleading statements to cover it up. Defendants Sanborn, Allocca, Gulati, Casey, and Williams further knew, but did not disclose publicly, that that these facts would substantially harm the Company. Defendants Sanborn, Allocca, Gulati, Casey, and Williams made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

148. At the time of their stock sales, defendants Sanborn, Allocca, Gulati, Casey, and Williams knew that when the Company's conduct came to light, the price of the Company's common stock would dramatically decrease. Defendants Sanborn, Allocca, Gulati, Casey, and Williams' sales of LendingClub common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

149. Plaintiff, on behalf of LendingClub, has no adequate remedy at law.

**COUNT V**

**Unjust Enrichment**
**(Against Defendants Sanborn, Allocca, Gulati, Casey, and Williams)**

150. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151. Defendants Sanborn, Allocca, Gulati, Casey, and Williams were unjustly enriched by their receipt of proceeds from their illegal sales of LendingClub common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1    152.    To remedy defendants Sanborn, Allocca, Gulati, Casey, and Williams' unjust

2  enrichment, the Court should order them to disgorge to the Company all proceeds derived from

3  their illegal sales of LendingClub common stock.

4                    **PRAYER FOR RELIEF**

5      **WHEREFORE,** Plaintiff, on behalf of LendingClub, demands judgment, as follows:

6      A.    Declaring that Plaintiff may maintain this derivative action on behalf of

7  LendingClub and that Plaintiff is a proper and adequate representative of the Company;

8      B.    Finding the Individual Defendants liable for breaching their fiduciary duties owed

9  to the Company;

10      C.    Finding insider selling defendants Sanborn, Allocca, Gulati, Casey, and Williams

11  liable for breach of fiduciary duty and misappropriation of information;

12      D.    Finding that demand on the LendingClub Board is excused as futile;

13      E.    Directing LendingClub and the Individual Defendants to take all necessary

14  actions to reform and improve the Company's corporate governance, risk management, and

15  internal operating procedures to comply with applicable laws and to protect LendingClub and its

16  stockholders from a repeat of the rampant wrongful conduct described herein;

17      F.    Imposing a constructive trust and awarding the Company the disgorgement of all

18  profits made by insider selling defendants Sanborn, Allocca, Gulati, Casey, and Williams as a

19  result of the fiduciary breaches alleged herein;

20      G.    Awarding the amount of damages sustained by the Company as a result of the

21  Individual Defendants' breaches of fiduciary duties, unjust enrichment, violations of securities

22  laws, and waste of corporate assets;

23      A.    Awarding Plaintiff the costs and disbursements of this action, including

24  attorneys', accountants', and experts' fees; and

25      B.    Awarding such other and further relief as is just and equitable.

26                    **JURY TRIAL DEMANDED**

27      Plaintiff hereby demands a trial by jury.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Dated:  July 19, 2018

Respectfully submitted,

THE WAGNER FIRM

/s/ *Avi Wagner*
Avi Wagner (#226688)
  *avi@thewagnerfirm.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:      (310) 491-7949
Facsimile:      (310) 491-7949

BRAGAR EAGEL & SQUIRE, P.C.
David J. Stone (#208961)
  *stone@bespc.com*
Melissa A. Fortunato (#319767)
  *fortunato@bespc.com*
Todd H. Henderson
  *henderson@bespc.com*
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:      (212) 308-5858
Facsimile:      (212) 486-0462

*Counsel for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, RICCARDO BARON, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint, that I have reviewed the Verified Stockholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

July_____, 2018
Jul 16, 2018

Riccardo Baron (Jul 16, 2018)
Riccardo Baron